May it please the court. My name is Donna Newman and along with Clara Calhouse who is appellant Delaware Mohammed Hossain. With the court's permission I will be addressing points one and two of appellant brief which deals with the use of and admission of the expert witness Dr. Tricia Bacon and Mr. Backrackt will address points three and four both points of which relate to the excluding defense access to classified information. Mr. Hossain comes before this court asking the court to vacate his conviction because the introduction and the use by the government in its summation of Dr. Tricia Bacon their expert witnesses testimony violated his due process and his right to a fair trial. Let me direct the court first to the government's use of Dr. Bacon's testimony in this submission. Specifically their extensive reliance on Dr. Bacon's testimony and what they categorize or name the playbook as a comparison, as a parallel, as a mirror to hold up to Mr. Hossain's conduct. And by doing that and by going point by point on what Dr. Bacon had testified as to what would be the typical conduct of a would be foreign fighter to the Taliban. You're implying that Dr. Bacon reverse engineered the playbook to the facts. Let me start again. I think you're implying that Dr. Bacon did not know the particular facts in this case. But my understanding is that Dr. Bacon testified that she did not know those facts. She was not told those facts and that she was testifying abstractly. Well, it is true, Your Honor, that that is what she testified. I did not know Hossain, but how convenient, how convenient that in the summation they lined it up as if here's Dr. Bacon point by point and by point and I can go through it. As they did. They took each, and they say it, it's not, this is their words from summation, taking each of the playbook steps in turn, the government argued that Mr. Hossain's conduct mirrored the typical conduct of the would be fighter. So there, no contact. Well, they said, you know, Dr. Bacon explained that to you. The no contact. That is, excuse me, prior to, let me put it in context, I'm sorry. No contact with anybody in Afghanistan, anybody from the Taliban, because that's typical of what a foreign fighter, would be foreign fighter would do. Then she went, planned to get to the border. Well, the testimony was, when you look at the totality of the testimony, that there was no plan. He had no map, no train schedule, no bus schedule, no plane. But counsel, you all were able to argue that in response. This doesn't strike me as all that different from what we see in drug cases and gang cases in pornography cases. It's it can be frustrating to deal with. But this sort of idea of a playbook that an expert witness for the government says this is what we routinely see. And then you can as defense counsel, you can say that's not meaningful here or that one similarity is outweighed by these five. But how how is it improper? Is it the it's the summation and the testimony you object to? Right. But you seem to be focused on the summation for now. Yes. But you get absolutely right. You're right. How is that improper? If the evidence came in, how is it improper for the government to make those connections as opposed to I understand you also challenge the admissibility. But once it's in, how is that summation improper? Well, to begin with, it's not it is the way that they used it. So let's be clear. They used it to find to argue to the court, to the jury that this evidence, Dr. Bacon's testimony actually was the evidence. I think and let me just make sure I have it in the rebuttal. That's exactly what they said. Yes, I'm sorry. That was A193. When they talk about in rebuttal about the testimony, let's turn next. I'm quoting now. Let's turn next to the defense argument that there is no evidence the defendant ever contacted anyone from the Taliban. Well, that was the truth. We don't argue with that. We didn't argue with what he said. That's the defense argument. But what is the actual evidence in this case? Dr. Bacon, they are equating Dr. Bacon testimony, her playbook, is the exact evidence because if you follow as they argued, what Dr. Bacon said, putting it up mirror for mirror. Well, what do we know? We that this court in U.S. versus Costello and U.S. versus Cruz said that's not permitted. And in other cases, too, there is a distinction, Your Honor, between saying, for example, in a drug case where they want to one of the evidence. One of the issues is distribution. Was the amount of drugs an amount that would be indicative of distribution? And I believe that was Tapia Ortiz that came in. And so the agent was allowed to testify as an expert as the typical amount that would amount to distribution of beepers. But what the court said very clearly, why they allowed that, why they didn't find error in Tapia Ortiz, is because there the prosecutors did not stress the similarities between the testimony of its fact witness and experts' description of a typical drug transaction. That's a case they relied on. That's exactly what happened here. Why is it so offensive? Because what you're asking the jury to do and what the government did ask the jury to do is to find Mr. Hussain guilty on what other people did by a third-party comparison, the typical conduct. But we know that that's not allowed. We know that that's not right. And it is not one statement here. We're not talking about an odd statement in between, you know, a full summation. It was really relied on. They played a they used that extensively, that comparison. Let me ask you to turn to your other argument, which is that Security Cleared Counsel was not permitted to, was denied access. Oh, I'm sorry. Your co-counsel will be arguing. Okay, sure. Mr. Bacroft will deal with that. That's fine. Yes. And he will answer all those questions, I'm confident. I'm not prepared today. And if you can, I think you've gone over your time, but if you can just conclude on this point, we'll actually go to the second part of the- You'd like to go to Mr. Bacroft's point? Yes. Okay, I did have two minutes and 35 seconds, but I will give that to Mr. Bacroft. It's actually gone down to zero, and it's counting back up. Oh. So your two minutes and 35 seconds- That's why we have the timer, because I'm not good with timing. But thank you very much. We've got some rebuttal time. Good morning, Your Honors. With a little indulgence, I'd just like to begin with a short story. My daughter this morning, she asked me what I was arguing today before this court. My daughter is eight years old. So I had to make the explanation very, very simple. And what I said to her was that I believe that criminal justice system works, but it only works when both sides play fair. And when one side withholds information from the other side that the other side is entitled to, it's sort of like cheating. It's not fair. That's really what this argument boils down to. The defendant asked for all the statements, electronic communications that had been seized, of his own statements that had been seized, and asked, what methods did you use to seize my client's communications? And specifically asked, did you use Section 702 of the FISA Amendments Act? Now, the answer to this question is simple. Yes, no, or no. Yes, we used it, and we have to go into classified as to what we can tell you or what we can't tell you. No, we didn't use it. Not, we've got to go into classified and you're not entitled to anything. Not, you're never entitled to know what process, what methods we used. That's important because it's the methods. Knowing the methods then helps us determine as defense counsel whether or not we even have a suppression motion to raise, whether or not that evidence that they seized infected the rest of the evidence in the case in one way or the other. Can I just ask you, I mean, you started out talking about believing in the process and the system, if you will, and I just, I understand, I believe you've had other cases related to these types of issues, and I'm just wondering what your understanding is of how this process normally works and what in this case suggests something different. Well, okay, so there's a lot of layers, no, there's a lot of layers to that. So let's start with a basic. If there's classified information involved, the government in the first instance, or I should say, the IC or the international community in the first instance, has to determine whether or not there is a need to know, that defense counsel has a need to know this information. Generally speaking, the IC community never thinks the defense counsel has a need to know, and it really becomes incumbent upon the prosecutors to then push and say, no, we think it is and here's why, and they will help explain that to the IC. In some cases, it gets turned over right away. A case like United States v. Ahmad Ghulani, which was a case involving enhanced interrogation techniques in black sites. All that was turned over right away. United States v. Jack Teixeira, the case right now in Boston, where the defendant was accused of leaking, a National Guardsman was accused of leaking lots of classified information onto Discord. Again, they realized the surveillance techniques were relevant to the case, so it was disclosed. It was disclosed in classified fashion. But the prosecutor turned to the IC and said, they need it. They have a right to know how the evidence came in against the client, and they turned it over. What's so extraordinary about this case is that they didn't do that. They didn't make the argument to the IC, it's got to be turned over, and if they did, they certainly didn't do it strongly enough. Because it can be done on the case. I thought it's all under a blanket of confidentiality. What I just said is, if they didn't do that, if they did do that. But first you said the extraordinary thing is they didn't do it, or if they did, they didn't do it strongly enough. Correct. How can we know either of those? What if they argued really strongly and either they lost or they were wrong? Well, if they argued strongly and they lost, then there's a problem and there's a breakdown in the system. Because there's something so basic here that the defense counsel should be entitled to have. And United States v. Arif makes that very, very clear. The state secret's privilege must give way if the information is relevant and helpful to the defense of an accused or, and this is the important part, or is essential to a fair determination of a cause. Well, knowing what the surveillance techniques were used, how the evidence was obtained in a case, is essential to a fair determination of a cause because that's how the defense counsel determines whether or not to raise a suppression motion. And, you know, we focused on Section 702 in this because there is, in fact, a specific notice statute under the FISA Amendments Act. And there are 15, excuse me, 50. If they intend to use the evidence, right? If, yes. If they intend to use the evidence or any evidence derived from it under 50 U.S.C. 1706C, they have to turn that over. That's correct. What if they say they won't or they didn't? Well, that's the, and that's where you get into part. That's where we are. Well, and that's point four, which is that's what they've said and we're saying you can't take them at their word. And the reason we're saying you can't take them at their word and the court has to dig deeper into this, and even if that means excluding counsel to dig deeper, but the court has to do it, is because when it comes to Section 702 surveillance, the government has a history, an extensive history, of not being forthright with either the counsel or the court. And United States v. Hasbarami is the perfect example of this, not even simply the Second Circuit case, but when you get to the very beginning of the case at the district court level. So in 2008, Section 702 surveillance as a program began, but it wasn't made public to anyone. It was completely concealed. Hasbarami starts conducting his, starts committing his crime, allegedly, in 2011 and gets arrested, I believe, 2012. One of the things Hasbarami asked, and I was his counsel, so that's why I know this, one of the things that he asked before pleading guilty in that case was, I've been hearing this stuff on the internet about these secret programs where they're allowed to surveil us without a warrant. Is that true? Did they do that in my case? Now, the government had specifically put in a notice in that case saying, we have not used any evidence in this case derived from FISA, period. They made that affirmative representation. So I turned to my client and said, look, no, they've got an obligation. They've got to tell the truth. It would be in the notice if they had it. Yes, but you said earlier that all you want to know is yes or no. What if they said no? Well, I mean, the eroded confidence that you're talking about would cause you to wonder whether they were being truthful. Correct, Your Honor, which point I would press it. But you'd have to accept that, right? If they said no, we did not, we did not employ Section 72. Well, we'd have to accept it initially, which is what the counsel did in this case initially, until other representations were being made which made them think, made them start to doubt it, which is why then the court is so important and why it's also so important that, okay, well, if it was, let's say, look, either it was 702 or it wasn't 702. It was something. There was something used to surveil. What's the, you know, 702 is the example we used because 702 has a notice statute. But the question is was 702 used? Well, it wasn't just 702 that we asked for. It was 702 or other things. We focused on 702 because 702 has a specific notice statute, which the government in the past has not been accurate to represent. But if it was something else, if it was truthful, they didn't use 702, they used something else, well, then tell us what that something else was because there, you know, I don't know if there's probably a notice statute related to that, too, and if there's not, there's certainly a due process argument for why we should be entitled to having it. 702 is the example we used because it's just so clearly written and because the government has such a lengthy history of not complying with their 702 requirements. They've only disclosed 702 notice in four cases, and Hasbarami was the last one. Four cases. We're post-trial, right? As was Hasbarami. Sorry? As was Hasbarami, and that's the point. Okay, but we are now post-trial. Yes. And so you are now aware of all of the evidence the government directly used against your client. Yes. I mean, because it was, anything either was or wasn't used at trial, right? So do you have an argument that some specific piece of evidence must, what is the evidence you point to that this could not have been derived from? Well, we don't have any, they've acknowledged that there were electronic communications of our client that they did not disclose. So we don't have all that evidence. And without that evidence, we don't know. But did they use them against your client at trial? Well, they didn't disclose them, so they didn't use them. But we don't know whether or not they would have. So then you wouldn't be moving to suppress them, right, because they weren't used. That would have been sort of the successful end of a motion to suppress. Those communications might have been useful, again, depending what's in there. No, that's a different argument. Towards then making the, connecting the dots to the evidence that came in. Sir, I understand the difference between Brady and, but you're talking about we need to know where they got this so that we can know whether to make motions to suppress and other kinds of motions. If we're talking about Brady, let's talk about Brady. But to me, that's a different question. The question of whether they have failed to disclose the techniques they used to obtain the evidence they actually used is different than did they adequately disclose all evidence they might not have been interested in but might have been useful to the defense. Those, to me, are different questions. They are, correct. To a great extent, they are. I don't think, I think there is an overlap. They're related, of course. There's an overlap, yes. But I understand what you're saying. There were text messages and there were WhatsApp messages that were introduced into evidence. There were not, I don't believe there were any e-mails introduced into evidence that was relied upon. But you have reason to believe those text messages and WhatsApp messages were derived from evidence that was obtained in a way that would have required notice? That's trial, that was trial counsel's belief. And so we have to support trial counsel's belief, yes. Okay. That was their conclusion. And because the government didn't offer an alternative explanation as to how they obtained that evidence? They did. And they filed it under SEAL and they filed it pursuant to SEPA and defense counsel was not provided access to it. And that's the problem. We have no idea what that alternative basis was. We have no idea if it was accurate or not. And, again, on point four, even assuming arguendo that we're not entitled to it in first blanche, taking the government's word initially for what they said, in those circumstances, SEPA provides specifically that when that happens, all those original arguments are set aside for appellate review so that the court of appeals can confirm the accuracy of the district court's determinations. So at the very least, this court has to do that. And I know I'm way over time, but I just wanted to say one thing on the standard of review because it is relevant to this, again. We have a dispute here on how to interpret abusive discretion. The government says it's your standard abuse of discretion. We say it's slightly modified. I think it is modified, and the way it's modified, as explained in ARAF, is yes, you apply abusive discretion, but you do it with the understanding that, as I said before, if the information in question is essential to a fair determination of a cause, is essential to being able to raise a suppression motion in this instance, then, according to ARAF, quote, the privilege must give way, end quote. And the Fifth Circuit has said this in Smith v. Black, and this is also what Judge Irizarry stated in one of the many, because Judge Gleeson and Irizarry had different district court opinions on this case, but in Judge Irizarry's district court opinion on this case, she said the same thing too. Now that we know there was Section 702, the notice was required to be turned over. So that's the point. Once it's been established that there is a connection to a need to raise suppression, then it is an absolute abuse of discretion if you don't allow the Sixth Circuit's privilege to give way. I keep hearing you talk in terms of suppression, but what seems a distinct issue is Brady. I mean, what relief would you seek or are you seeking? How would this play out in the district court if we said there's a Brady issue here? What would you want the district court to do? Disclose it to defense immediately? And depending what the Brady issue is— The district court has already gone through this material. Well, Your Honor just said if you determined there was a Brady issue here. So maybe I'm misunderstanding. I thought you were saying that if the court were to review the information— Well, I mean, we can't determine if there's a Brady issue unless you raise a Brady issue. What is the helpful information that you intuit or you fear was not produced to you and that the judge would not have turned over to you even after a conscientious search of the materials that the government gave to the judge? Statements indicating that there was never an intent to go through with the alleged scheme. Statements indicating that, in fact, yeah, no, they were doing these things, but they weren't actually going to leave Thailand. Or statements indicating that they had the tent with them, for example, because they intended to go hiking. Any statement that would indicate that that wasn't where— that substantial step that was necessary to go next wasn't actually going to happen. Thank you. All right. Thank you, Mr. Rector. We will hear now from the government. Ms. Lasky. May it please the court, my name is Kaylin Lasky, and I am an assistant United States attorney in the Southern District of New York. I represent the United States on appeal, and I represented the government at the end of post-trial litigation below. I'd like to start with the issue of the expert testimony. The district court here did not commit manifest error or error at all by admitting Dr. Bacon's testimony. Her testimony about terrorist groups on the other side of the world and the people who travel from around the globe to join them address topics that are simply beyond the ken of the average juror. Crucially here, her testimony also allowed the government to meet Hossein's defense here, which was his express plan to travel to join the Taliban was mere fantasy. This was something that was stated from opening and reiterated throughout the trial. This court has repeatedly affirmed the admission of testimony in similar contexts. It's my case, though, that it's responsive to that idea of what his actual intent is. I mean, I think in the briefing you explained that this is appropriate because it's being used to rebut sort of an implausibility argument, but is the defense argument really implausibility, or is it that no, this is actually not what his intent was, and how does the expert testimony speak to that? So I personally see those two things as being connected. The defense was arguing that the government's view of things was implausible, improbable, that really what was going on here was this was someone with a wild imagination. The government, however, believed, and through Dr. Bacon's testimony in part, corroborating this, that, in fact, this was about what he truly intended, which was to go across the world and to join a terrorist organization. Right, but is that really implausible? I think, you know, if the argument is implausible, he would do this because that's not how people go join the Taliban. People don't travel through other countries. If they're calling into question the plausibility of that type of circumstance versus that's not what this person was doing, it's implausible because of all these various factors about his circumstance. I guess I don't know if that was a question, but I guess that's the sort of distinction I'm wondering about. I'm not sure, and I apologize, but I'm not sure if I'm fully understanding the distinction here. Well, let me ask a question then. So I have two cell phones, and I have heard a lot of arguments at drug trials about the fact that drug dealers have multiple cell phones. But if I were charged with drug crimes and the expert testified that in their personal experience, in their expertise, drug dealers have multiple cell phones, my argument wouldn't be that's not true. My argument would be I have two cell phones because I have a work phone and a personal phone. And I think what Judge Lee is saying is here, this defendant is not necessarily saying that's not what people who want to join the Taliban do. He's saying I don't know what those guys do, but here's what I was up to. I was interested in going overseas to meet women and travel. It's not so much that your explanation doesn't ever happen or isn't possible. It's that that's just not what he was doing. So how does the expert then help? If he's saying that may well be true about terrorists, but it's not true about me. So I think here the government was justified in meeting that argument in some way, and one way to do that was through the testimony of Dr. Bacon. It showed that what he said and did reflected what actually happened in the real world, that it was not a fantasy world, and therefore it showed his intent. And I think it's particularly relevant here because the defendant talked a lot in these recordings about having researched the Taliban, having done research into any number of aspects of the Taliban's functioning, sent links around to the confidential sources showing that he knew what was happening in the real world. And so the inference that can be drawn there is that it was also happening, or that that was one thing that was motivating him. And other aspects of Dr. Bacon's testimony had the same purpose and would not have been known to the lay public. So, for example, the Taliban's commitment to killing Americans specifically. This testimony was relevant to the facts in the case here. It shed light on why the Taliban was at war with the United States, why there were Americans in Afghanistan, and it was also specifically relevant to the charges here against the defendant. In count one, the jury was required to determine if Hossein knew or intended his attempted material support would be in connection with the killing of nationals of the United States located outside of the United States. So it's for these reasons that we believe that the testimony here was entirely proper and certainly was not manifest error. With respect to the guilt by association argument that the defense brings up here, I do think this case is distinguishable from many of the cases that the defendant principally relies on. Again, these were cases where intent or improbability were not actually argued in many instances. In many of those cases, such as Castillo, Cruz, and Mejia, really the court there was interested about how the defense witness was an officer expert and some of the particular issues that adhere in cases where officer experts are testifying. Here, of course, Dr. Bacon was an academic. She was not testifying about the statistics of a particular task force that she had worked on. And there are also concerns in the strand of law about having expert witnesses improperly buttressing fact witness testimony. Again, not an issue here, not something that was happening. Now, the government does believe there was no manifest error, but even if there was, it was harmless in light of the extensive evidence of Hossein's guilt in this case. We've set forth much of that in this brief, but it included his own statements in WhatsApp chats and recorded calls and meetings about his plans to attack a military base here in the United States, about his plans and how they shifted to going abroad in order to join the Taliban in Afghanistan, how he would accomplish that, how his goal was to kill some, as he put it, kuffar before he died, and about the video links and everything else he sent around. And it also included so many substantial steps that he took, including recruiting six other people at least, saving $10,000 in preparation for the trip, buying travel gear, including cold weather sleeping bags for the Afghan mountains, identifying a mosque he could go to in Pakistan where he thought he would be able to make connections and then travel to his intended destination, reaching out to a former Taliban fighter, going to strip clubs and buying drinks and cutting his hair to evade law enforcement, as he put it, and buying an airplane ticket and eventually trying to board a plane. Based on this evidence, the defendant cannot meet the required standard here. Similarly, Dr. Bacon's testimony during summation were proper and certainly not plain error as required here because there was no contemporaneous objection. As this court is aware, this court does give prosecutors statements wide latitude and views them in the context of the entire trial. Here, I would push back on defense counsel's characterizations of how Dr. Bacon's testimony was used during summation. There were references, but the bulk of the time was spent going through the evidence, some of which I have just listed for the panel. And the government was entitled to refer to her testimony because defense had argued that the evidence showed that Hossain's statements and actions were merely evidence of his wild imagination. They said this over and over again, and the government was entitled to meet that argument. Therefore, it certainly was not flagrant abuse, and there's no substantial prejudice based on all the evidence in the case. Additionally . . . Let me ask you to turn to the other issue. Of course. In the case, when the government produced documents to Judge Stein, I believe, for him to review in order to determine, among other things, whether there was anything there that would be useful to the defense, was the government fully aware of what the defense was going to be? Because if you were not aware of what the defense was going to be, there's no reason to think you would have looked for, identified, and produced for Judge Stein's attention documents that would be helpful to the defense. Your Honor, I was not part of that team that worked on that particular issue, but my understanding, just from reading the same record that this court has before you . . . But then you can't make a representation. Correct. But, Your Honor, I know from reading the same . . . the record in this case, the docket entries, everything else, that a Section 2 conference was held where defense counsel was able to meet ex parte with the judge and air any of their concerns and to specifically set forth what their view of the case was. Yes, it was an ex parte meeting in which the judge knew in detail what the defense was going to be. But unless the prosecution knew, how could the prosecution look through the confidential material collected on this case in order to know what would be helpful to the defense? So, after that Section 2 conference, my understanding is that some of the substitutions were rewritten after a further ex parte conversation between the government and the court. And I think, Your Honor, this is no different than any other case in which the government is required to think expansively and to determine what could be of use, whether in the classified context or not, by the defense. I understand, but here everything is going on behind a screen, which naturally should make every judge queasy about this way of proceeding. And where would I look to find an affidavit that would satisfy me on that point? An affidavit that the government . . . Yes, that says the government, we the government, whoever, knew that this was the defense and we searched for information that would be helpful to that defense. Because by the time you're talking to the judge in the ex parte meeting and finding out in detail what the defense is going to be, which the judge probably couldn't tell you anyway, you already did the job of turning over to Judge Stein that which he would look through. If he didn't know what the defense was, he certainly wouldn't find anything helpful to the defense on it because the government would know or feel perhaps obligated to include such material for review by Judge Stein. There was, Your Honor, extensive briefing down below, including a motion to compel, specifically with respect to some of the issues raised by Mr. Bachrach. There was a renewed motion to compel regarding the same issues. These were issues that were percolating in the case for a very long time, it appears. So I do believe it's something that was considered by... It's percolating. It's not all that reassuring. Your Honor, I do think if reading these motions and reading the judge's order on these issues, it is clear that the parties were discussing the defense's view of the case, including, again, this desire to get FISA obtained or FISA-derived information for a very long time. This was certainly known to the government, certainly known to the court, and was something that the government briefed below and was certainly considered by the court. And I would also, on that note, note that the district court did not abuse its discretion in concluding that the FISA provisions weren't at issue. Defense counsel makes a number of arguments, but they're frankly pure speculation. Nothing in the record shows... It's a little unfair to say they're speculating when they don't know anything because you have a screen of confidentiality. It's secrecy. So, Your Honor, for example, and we say this in our brief, whatever happened in the other cases that Mr. Bachrach has cited to this panel, it is clear from the record here, and this was something that was presented at trial, that this defendant approached the confidential source at a mosque and that was how the communications began. There's no question there's evidence on the side of the prosecution. The question is, what could have been helpful to rebut that? So, respectfully, Your Honor, there is an entire framework that is in place here and put in place by SEPA and clear law in the circuit, as expressed in cases such as Al-Farak, which specifically deal with instances where counsel is cleared. And even in that situation, it is clear that Section 4 explicitly allows for ex parte review. This is true when defense counsel has security clearance. SEPA does not have a carve-out for cleared counsel. It's ex parte review, by a judge, of what the government turns over to the judge to review. That's correct. So the judge doesn't review. So when the government first looks at, you get somebody's Yahoo account, Gmail account, whatever, right? You get the email account. The government then goes through that and says, oh, all these emails with his mom about whether his dad's feeling better, those are not important to our investigation. And the government calls down to a universe that it then focuses on. And that's what it starts, and this is a traditional case I'm talking about, that's what it starts disclosing. So it's a drug investigation. They think they have no interest in the defendant complaining about his tough session at the gym or his breakup with his girlfriend. Who knows? And so that's not even part of the subset of information that's then used in the case. So I think what Judge Jacobs is trying to get to is, if the government has culled this information down, does it then, when it learns of a defense, say it turns out later that the defendant is, his father's health is relevant to his defense. Does the government go back, zoom out to the original larger universe of emails they seized from my Yahoo account, and reassess to see whether anything not just is relevant to the government's theory, but is relevant to the now disclosed or known defendant's theory of the case? Or do they stay with that original corpus? So I would agree. In that situation, the government would go back and would review. So is that, I mean, that's my question then. So here at some point after the investigation began, the government became aware that the defendant was going to raise a defense, whether that was not until trial or at these ex parte meetings or somewhere along the way. The government says, oh, okay, his argument's going to be, I didn't travel for purposes of terrorism, I traveled for personal romantic purposes. So at that point, does the government go back and check again? That's the question that I'm wondering about. My understanding of the record in this case is that there was not a point in time where that particular argument suddenly became known. I think it was something that was percolating for a long time in the case. Well, it could have percolated before the defendant was aware of the investigation, which is presumably when some of this investigative work was going on. That's usually the course, right, is that the government's working on stuff and stuff is percolating on the government side before the defendant has any knowledge or any, has formulated or identified or articulated a defense. Sure. Okay. So how could the government have been taking into account those ideas in its initial sort of process, its investigative process, if they hadn't, had the government just get creative and think, oh, I bet his defense is going to be, even though this is someone that is portrayed by the government as a faithful Muslim who is a true believer, that the government's going to think, I bet he, it might argue he went to Thailand to meet women, and therefore we're going to look for that, look for information that might support that defense in all of our reviews from day one. So I think there might be a disconnect here about when the SIPA process happens and when this review occurs. It is after an indictment is filed that the government will then, typically the court will have a conference in which there's a discussion about classified issues, and it's after that that the government begins this review process. And so here as well, there's a review process, there's a process of writing a Section 4. So the government doesn't look at any of the material collected through traditional or FISA techniques until after indictment? No, Your Honor, I'm not saying that. Okay. But I'm not sure that the government looking at something at an earlier point in time versus. . . They don't reduce the overall corpus of, they don't reduce the evidence to what's usable or disclosable before indictment? Is that the. . . I think it depends on the particular case and the volume and the targets at issue. But I think given what we know here, it's set forth in a ref that there's this process, right? It's whether the classified information is discoverable in the first place. Would disclosure be inimical to national security? Is the state secret privilege asserted? And it's only then, if the answer is yes, that whether the information is relevant and helpful to the defense is determined. And there's a need to know, essentially, in that case. Let's take a rather specific example. There's a woman in Bangladesh. She has a name. I won't use it. But part of the defense is that he was traveling to see that particular person. If the government didn't know that, then they wouldn't search their files to try to find out about her and about plans she may have that would dovetail with his plans or pick up the fact that he's planning to see her. So in this case, the discussions of that woman, and it's not a real person's name, so I feel comfortable saying Amira, that is specifically discussed in the recording, so something the government knew and, frankly, the defendant knew. Something the government knew when it was gathering the materials from the woman called what would go to Judge Stein, including possibly useful information for the defense. That would have been one of the many facts that the government would have been aware of at that time. And, again, I can't in this setting speak to specific issues. But here, Your Honor, we do believe the district court got this right and that it followed the CEPA procedure and the clear law of the circuit as expressed in cases like Al-Furek. There was no abuse of discretion. That said, it is at the court's discretion if you would like to review that record. We are, of course, more than happy to work with the CISO to facilitate the panel's review. All right. Thank you. All right. Ms. Newman, you have two minutes. I will be brief. We disagree with what the record reveals with respect to what Mr. Hussein said and what he did, and we will rely on the record. But, for example, with respect to recruiting six people, nobody ever met them. In addition, at the beginning of this process, I think it was September, one of the first recorded conversations, it's the first confidential source mentions recruiting and that he would recruit. And there was a whole discussion based on what that CS said with respect to weapons, based on what he said. And Mr. Hussein said, well, I have a sword. So the defense was not that it was a wild imagination, although they did say that. I'm not saying that the defense did not say that in summation, but what they said totally in their summation. And if you look at the cross-examination during the trial, it went to what he was saying, which they never dispute he said. They never said that's not exactly right, it wasn't recorded right, or something to that effect. What they said, that's not the whole picture here. And so it was what he said and what he did when you looked at the whole evidence. And the summation said very clearly the government, when you look at the totality, did not prove their case with respect to specific intent and with respect to substantial step beyond a reasonable doubt. And that's why their cross went into, well, there was no plan, even in July, there was no research on Tavel Road. This went all to, there was another plausible explanation. Based on the conduct, not just the words. So I think that that's important. When the court considers the arguments, the total, and it wasn't that it was just wild imagination. I know that my time is just about up, and I know that Mr. Bancroft has more to say, unless the court has other questions. No, thank you. Okay, thank you. Thank you, Your Honor. The government mentioned a minute ago, two minutes ago, that the arguments with respect to Amira were known to them at the time because they were on the recording. So that was something they would have brought up. But it's important to note that there is a six-month gap between when the defendant meets CHS-1 and when the recordings begin. And it's that six-month gap of discovery, that information, what is it that was happening during that time, where other things could have come up. One of the things that, for example, the defense wanted to raise, and that may have been available in whatever surveillance occurred during that six-month period of time, was evidence going to show his lack of intent or evidence going to show an entrapment defense. That was one thing that they actually raised with the judge, that they wanted to raise an entrapment defense and needed to see if in this information, in this braiding material, potential braiding material, was there anything there about entrapment that could support that defense in the six-month gap of information. And because the judge then disavowed an entrapment defense based upon the representations that had been made before it, but the defense didn't have this information. So had they had the information, they may have been able to establish why an entrapment defense was, in fact, something that should have been allowed and should have been considered viable. Also, just, Your Honor, to answer a question Your Honor, Judge Jacobs asked, to my knowledge, there is no, to be very clear, there is no affidavit that the government ever submitted specifically stating that they looked to an entrapment defense or any other defense that could have potentially been taking place, particularly in that six-month gap, to see if there was something helpful for the defense for braiding. I don't know. I haven't seen it. What is that six-month gap? Could you just state the date? It was a six-month period between when the defendant first met... Just note the dates. Oh. March, March. Just roughly. March of 2001. March of 2018 through September of 2018 was the first recording. Thank you. March of 2018 to September of 2018. March is when he met the CHS-1 for the first time at the mosque, and September is when the recordings began that were disclosed. Thank you. All right. Thank you very much. Thank you very much, Your Honor. Thank you, all of you, and we'll take the case under advisement.